# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DARIAN HELMANTOLER,

                    Plaintiff,

    Vs.

JASON WASLH, in his individual
capacity, RYAN LENZI, in his
individual capacity, BRADY
STALLINGS, in his individual capacity,
LESLIE RIDGE, in her individual
capacity, CITY OF MONONGAHELA
POLICE DEPARTMENT, CITY OF
MONONGAHELA, a municipal
corporation, WASHINGTON COUNTY
DISTRICT ATTORNEY'S OFFICE,
WASHINGTON COUNTY
PENNSYLVANIA, and
WASHINGTON COUNTY
CORRECTIONAL FACILITY,

                    Defendants.

No. 2:25-cv-942

TYPE OF PLEADING:

**COMPLAINT**

**Filed on behalf of Plaintiff:**
Darian Helmantoler

**Counsel of Record for this Party:**

Joseph V. Charlton, Esquire
PA Id. No. 200429

D. Robert Marion Jr., Esquire
PA Id. No. 313469

Chelsie R. Friend, Esquire
PA Id. No. 327853

CHARLTON LAW
617 S. Pike Road
Sarver, PA 16055
(724) 540-1161

**JURY TRIAL DEMANDED**

DARIAN HELMANTOLER,    )  No. 2:25-cv-942
    )
          Plaintiff,    )
    )
    Vs.    )
    )
    )  TYPE OF PLEADING:
JASON WASLH, in his individual  )
capacity, RYAN LENZI, in his  )
individual capacity, BRADY  )  **COMPLAINT**
STALLINGS, in his individual capacity,  )
LESLIE RIDGE, in her individual  )  **JURY TRIAL DEMANDED**
capacity, CITY OF MONONGAHELA  )
POLICE DEPARTMENT, CITY OF  )
MONONGAHELA, a municipal  )
corporation, WASHINGTON COUNTY  )
DISTRICT ATTORNEY'S OFFICE,  )
WASHINGTON COUNTY  )
PENNSYLVANIA, and  )
WASHINGTON COUNTY  )
CORRECTIONAL FACILITY,  )
    )
          Defendants.  )
    )
    )
    )
    )

## **COMPLAINT**

AND NOW, comes Plaintiff, Darian Helmantoler, by and through her attorneys Joseph V. Charlton, Esquire, D. Robert Marion Jr., Esquire, Chelsie R. Friend, Esquire and CHARLTON LAW, who files this Complaint and avers the following:

## **INTRODUCTION**

1.    Darian Helmantoler (hereinafter "Ms. Helmantoler"), brings this action pursuant to 42 U.S.C. § 1983 alleging that she was falsely and unlawfully detained, arrested, imprisoned, maliciously prosecuted, and punished in a cruel and unusual manner

after the death of her twelve-day old son, A.D by Defendants. As a result of the actions of

the Defendants, Ms. Helmantoler has suffered severe mental, emotional, physical, and

economic damages.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343 and has

supplemental jurisdiction to hear Ms. Helmantoler's state claims under 28 U.S.C.

§1367(a).

3.      Venue is appropriate in the Western District of Pennsylvania because it is

where the cause of action arose and is a district in which Defendants regularly conduct

activity.

## PARTIES

4.      Ms. Darian Helmantoler is an adult individual residing at 513 Jackson

Street, Monongahela, Washington County, Pennsylvania.

5.      Defendant, Jason Walsh, is an adult individual, and at all times material

hereto, was the elected Washington County District Attorney maintaining his official

office at 26 South Main Street, Washington, Pennsylvania, 15301, and at all times

material hereto, Defendant Walsh acted under color of law. He is sued in his individual

capacity.

6.      Defendant Leslie Ridge, is an adult individual, and at all times material

hereto, was an Assistant District Attorney in the Washington County District Attorney's

Office with an address of 26 South Main Street, Washington, Pennsylvania, 15301. She is

sued in her individual capacity and as an agent of Defendant Walsh by and through her employment.

7.    Defendant Brady Stallings, is an adult individual, and at all times material hereto, was employed by the City of Monongahela Police Department with an office at 451 West Main Street, Monongahela, Pennsylvania 15063, and at all times material hereto, Defendant Stallings acted under color of law. He is sued in his individual capacity.

8.    Defendant, Ryan Lenzi, is an adult individual and at all times material hereto was employed by the City of Monongahela Police Department with an office at 451 West Main Street, Monongahela, Pennsylvania 15063, and at all times material hereto, Defendant Stallings acted under color of law. He is sued in his individual capacity.

9.    Defendant, Washington County District Attorney's Office, is a local governmental body that employees Defendants Jason Walsh and Leslie Ridge. Its official address is 26 South Main Street, Washington, Pennsylvania, 15301.

10.    Defendant City of Monongahela is municipal subdivision of the Commonwealth of Pennsylvania and the legal entity responsible for the City of Monongahela Police Department and is the employer of Defendants Brady Stallings and Ryan Lenzi. Its official address is 449 West Main Street, Monongahela, Washington County, Pennsylvania 15063.

11.    Defendant City of Monongahela Police Department is a local governmental body and the supervisors of Defendants Brady Stallings and Ryan Lenzi. Its official address is 451 West Main Street, Monongahela, Washington County, Pennsylvania 15063.

12.    Defendant Washington County is a local governmental body with an address of 95 West Beau Street, Washington, Washington County, Pennsylvania, 15301.

13.    Defendant Washington County Correctional Facility is a local governmental body with an address of 100 West Cherry Avenue, Washington, Washington County, Pennsylvania, 15301.

14.    Upon information and belief, all individual Defendants are citizens of the United States and residents of the Commonwealth of Pennsylvania.

## FACTUAL BACKGROUND

### A. Unlawful arrest and detention of Darian Helmantoler

15.    Ms. Helmantoler gave birth to her son, A.D., on or about August 30, 2023.

16.    At the time Ms. Helmantoler was residing at 201 Chess Street, Apartment B, Monongahela, Pennsylvania, 15063.

17.    On the morning of September 12, 2023, Ms. Helmantoler awoke to find A.D, breathing abnormally, bleeding from his nose, and appearing discolored.

18.    Ms. Helmantoler immediately dialed 9-1-1, and Emergency Medical Technicians (hereinafter "EMTs") from Tri Community Ambulance responded to Ms. Helmantoler's home.

19.    Ms. Helmantoler heard the ambulance coming and immediately went outside and gave A.D. to the EMTs.

20.    The EMTs immediately began rendering aid to A.D.

21.    Ms. Helmantoler went back into the residence to grab her shoes, purse, and other personal belongings to take with her to the hospital.

22.     Defendant Ryan Lenzi of the City of Monongahela Police Department also responded to Ms. Helmantoler's residence.

23.     When Defendant Lenzi arrived, Ms. Helmantoler came back outside because she assumed she was going to leave with the ambulance.

24.     Defendant Lenzi approached Ms. Helmantoler and asked her what happened.

25.     Ms. Helmantoler explained what she observed about A.D. when she woke up.

26.     Defendant Lenzi then asked Ms. Helmantoler to show him where A.D. was sleeping inside of the residence.

27.     As Ms. Helmantoler walked into the residence, per the instruction of Defendant Lenzi, she was also speaking to her mother on her phone and stated that she was about to end her life, clearly distraught over the incident and situation.

28.     Defendant Lenzi asked who was with Ms. Helmantoler in the residence and she stated she was alone.

29.     She also stated that she last fed A.D. at 4:00 a.m. and later awoke to observe that he was breathing abnormally, bleeding from his nose, and appeared discolored.

30.     Defendant Brady Stallings also responded to Ms. Helmantoler's residence.

31.     Defendant Stallings is a part-time police officer for the City of Monongahela Police Department.

32.     Defendant Stallings went to the ambulance, and the EMT reported that he found the incident suspicious because A.D. had blood coming out of his nose.

33.     Defendant Stallings then entered into the residence where Ms. Helmantoler was speaking to Defendant Lenzi.

34.     Defendants Lenzi and Stallings asked Ms. Helmantoler a few general questions about the living situation and the circumstances surrounding A.D.'s injuries.

35.     Defendant Lenzi then read Ms. Helmantoler her Miranda Rights, and Ms. Helmantoler agreed to continue speaking to Defendants Lenzi and Stallings.

36.     Defendants Lenzi and Stallings then asked multiple times if anyone else lived at the house or was at the house. Ms. Helmantoler responded multiple times that only she and A.D. were currently living in the residence.

37.     Defendant Lenzi then stepped out of the house and went into the ambulance to speak with the EMTs and observe A.D.

38.     The EMTs stated that the child was in cardiac arrest, and Defendant Lenzi returned to Ms. Helmantoler's residence.

39.     Ms. Helmantoler asked Defendants Stallings and Lenzi what was happening to A.D.

40.     Defendant Stallings told her that the EMTs would let them know.

41.     Despite just returning from the ambulance, Defendant Lenzi said he did not know because he did not go into the ambulance. Thus actively concealing the condition of A.D. from Ms. Helmantoler.

42.     Ms. Helmantoler then indicated that if A.D. was not going to be ok then she was going to jail and was going to kill herself.

43.     Ms. Helmantoler then gave her name and phone number to Defendant Stallings and asked if her mother had arrived.

44.     Defendant Lenzi then instructed Defendant Stallings to detain Ms. Helmantoler.

45.     Defendants Lenzi and Stallings detained Ms. Helmantoler and explained that they did not know what happened to A.D. and she was being detained until they could find out what happened.

46.     Ms. Helmantoler again explained that she called the ambulance because A.D. was breathing abnormally, bleeding from his nose, and appeared discolored.

47.     Ms. Helmantoler then asked to sit on the porch and asked again for an update about A.D. Defendants Lenzi and Stallings stated that they did not have an update to give her because the ambulance had left with A.D.

48.     Ms. Helmantoler's mother, Deanna Maslo, arrived and Ms. Helmantoler started crying.

49.     Ms. Helmantoler instructed Ms. Maslo to go the hospital, and Ms. Maslo asked Defendants Lenzi and Stallings if A.D. had died.

50.     Defendants Lenzi and Stallings told Ms. Maslo that they did not know if A.D. was deceased, and Defendant Stallings asked if Ms. Maslo wanted to go to the hospital.

51.     Ms. Maslo then asked Ms. Helmantoler if she smothered A.D., and Ms. Helmantoler denied smothering him.

52.     Ms. Helmantoler again expressed that she wanted to end her life.

53.     Ms. Helmantoler also again re-asserted that no one else was in the residence except her and A.D.

54.     Ms. Maslo then left and went to the hospital.

55.     Defendant Lenzi continued questioning Ms. Helmantoler on whether someone else was in the house during the evening. Once again, she denied that anyone else was in the house.

56.     She explained that she had been relaxing on the front porch and would periodically go inside and check on A.D.

57.     Ms. Helmantoler asked again for an update and stated that if A.D. dies, she is going to jail.

58.     She denied doing anything to A.D., but expressed frustration that she could not be a mother if she could not watch her baby sleep.

59.     She once again stated her desire to kill herself if A.D. was dead.

60.     She asked if a nosebleed indicates that A.D. was suffocating.

61.     Ms. Helmantoler reported that she was sleeping with A.D. and fed him at approximately 4:00 a.m. before falling back asleep.

62.     Defendant Stallings asked Ms. Helmantoler if A.D. always slept in the bed with her. She responded that A.D. did not always sleep in the bed with her, but that he had slept with her the last two nights.

63.     Ms. Helmantoler explained that she drank one Twisted Tea at her bed and two on the porch (she explained later that she did not finish one of the Twisted Teas on her porch).

64.     She also explained that an unknown male had asked to drink with her on her porch and she declined. She did not let him inside, but expressed some concern that he may have entered her residence without her knowledge.

65.     Defendants Stallings and Lenzi walked into the house to discuss the case outside of the presence of Ms. Helmantoler.

66.     Defendant Lenzi indicated that he was going on vacation, so Defendant Stallings agreed to investigate the case.

67.     Defendant Stallings was instructed by Defendant Lenzi to coordinate his investigation with Defendant Leslie Ridge of the Washington County District Attorney's Office.

68.     Defendants Stallings and Lenzi then went back outside and asked Ms. Helmantoler some additional questions.

69.     Ms. Helmantoler again asked if A.D. was alive, and Defendants Lenzi and Stallings again stated that they did not know.

70.     Friends of Ms. Helmantoler arrived on scene, and Ms. Helmantoler explained to them that she woke up and A.D. was breathing abnormally, bleeding from his nose, and appeared discolored, so she called the ambulance.

71.     The police confirmed that Ms. Helmantoler fed A.D. at 4:00 a.m.

72.     Ms. Helmantoler again stated that she was going to kill herself.

73.    In response, Ms. Helmantoler's friend offered to call Crisis.

74.    Defendants Lenzi and Stallings instructed them not to call Crisis and promised that they would get Ms. Helmantoler the help she needed.

75.    Ms. Maslo did eventually arrive at the hospital where A.D. was being treated.

76.    A police officer stationed at the hospital would not allow Ms. Maslo to see A.D.

77.    The officer instead instructed Ms. Maslo to go to the police station.

78.    Ms. Maslo asked the police officer if A.D. had died. The officer confirmed that A.D. had died.

79.    Defendants Jason Walsh and Leslie Ridge, from the Washington County District Attorney's Office, also responded to Ms. Helmantoler's home and assisted in the investigation.

80.    In the midst of this traumatic incident, Ms. Helmantoler was taken to the police station.

81.    Despite verbalizing clear suicidal ideations, Ms. Helmantoler was not offered any medical or mental health treatment.

82.    Instead, the Defendants interrogated Ms. Helmantoler.

83.    After repeating her Miranda Rights, Ms. Helmantoler was interrogated by Defendant Lenzi as well as Detectives Hancock and Mysza. Detective Mysza was with the Washington County District Attorney's Office.

84.    Under interrogation, Ms. Helmantoler stated the following:

a.  A.D. was inside of the house all night while she was relaxing on the front porch;

b.  She had a camera so she could hear and see A.D. while she was on the front porch;

c.  She had approximately three (3) Twisted Teas between approximately 10:00 p.m. and 1:30 a.m.;

d.  At approximately 4:00 a.m., A.D. woke up and she fed him, burped him, and went back to sleep. A.D. seemed normal at 4:00 a.m.;

e.  She then woke up and noticed that A.D. had a cut on his forehead. She picked him up and realized A.D. was not moving as he normally would, that he was bleeding from the nose, and losing his color;

f.  She then placed A.D. back down and immediately called 9-1-1;

g.  When EMS arrived, she took A.D. outside and gave him to EMS;

h.  She then explained what happened the day before and the medical history of A.D. including the date of birth, wellness checks, etc.

i.  She explained that A.D. usually slept in his bassinet, and he had only slept in her bed for the last two nights;

j.  She confirmed again that she drank three Twisted Teas and stopped drinking them around 1:30 a.m. She also confirmed that she did not drank any alcohol during her pregnancy and this was the first time she drank alcohol since giving birth;

k.  She also explained that she did not finish the third Twisted Tea;

l.  She explained that while she was on the front porch drinking and smoking, she could see A.D. through the camera and would go back in if he was fussy;

m.  She also sat with A.D. in her bedroom and watched a football game;

n.  She eventually fell asleep after 1:00 a.m. and A.D. was sleeping next to her on his pillow;

o.  She denied falling asleep while holding A.D.;

p.  She again confirmed that she woke up at 4:00 a.m. and fed and burped A.D.;

q.  She again confirmed that she woke up again at 8:00 a.m., saw a cut on his head, picked him up, noticed he was not moving normally, his nose was bleeding, he was struggling to breath, and his color was not normal.

r.  At that time, she called 9-1-1;

s.  While she was waiting for the ambulance she was patting A.D.'s back, but she did not perform CPR;

t.  Ms. Helmantoler started crying during the interrogation;

u.  The police directly asked Ms. Helmantoler if she harmed A.D. and she denied doing so;

v.  The police directly asked Ms. Helmantoler if she was on top of A.D. when she woke up and she said no;

w.  The police directly asked Ms. Helmantoler if she got frustrated and started shaking A.D. and she said no;

x.  Ms. Helmantoler kept repeating that she would harm herself before she ever hurt A.D.;

y.  Ms. Helmantoler expressed that she was depressed because A.D.'s father was acting inappropriately and that was why she was drinking;

z.  Ms. Helmantoler was repeatedly asked and repeatedly denied that she harmed A.D.;

aa. The police repeatedly told Ms. Helmantoler that now was the time for her to explain herself, that accidents happen, and that babies don't just end up like her baby;

bb. The police expressed to her that they did not believe her;

cc. After repeated questioning from all three police officers, Ms. Helmantoler eventually stated that she may have rolled on to A.D., but said she did not remember;

dd. The police directly asked again if she was on top of A.D. when she woke up, Ms. Helmantoler again denied that she woke up on top of him;

ee. The police again repeatedly questioned her about rolling over on to A.D. and suggesting that it may have happened and Ms. Helmantoler again said it may have happened;

ff. The police also asked if Ms. Helmantoler would be willing to take a lie detector test and she agreed that she would take it and would pass it;

gg. Ms. Helmantoler told the police that if A.D. dies then she is not going to be ok, and the police will need to do something for her;

hh. She expressed that A.D. was the only thing that kept her going and she did not blame him for her issues with depression;

ii. The police kept circling back to whether Ms. Helmantoler did something to A.D. and she kept denying that she did anything to harm her child;

jj. The police also directly asked her if she put her hand over A.D.'s mouth and she said no;

kk. The police again asked if she would be willing to take a polygraph test and she said she would take the test;

ll. Ms. Helmantoler asked again for an update on the status of A.D.;

mm.    The police lied to Ms. Helmantoler, stating that HIPPA prevents the hospital from giving them updates and that they did not have an update;

nn. Ms. Helmantoler said maybe she did turn over, and that was the only thing she could think of;

oo. At the end of the interrogation, Ms. Helmantoler again explained what happened that caused her to call an ambulance;

pp. Ms. Helmantoler also explained that she has had issues with alcohol in the past, but she did not drink while she was pregnant; and

qq. She also stated that she has medication for depression, but that she was not taking it because she did not like it and was scheduled to meet with the doctor to discuss medications.

85.     Ms. Helmantoler's statements were consistent from the time she called 9-1-1 through her interrogation.

86.     After the interrogation, the police told Ms. Helmantoler that they had "bad news" and that she had to go in front of a magistrate.

87.     Ms. Helmantoler started weeping and she was placed in shackles.

88.     Ms. Helmantoler asked if she could see A.D. and the police denied the request.

89.     Ms. Maslo came into the room and Ms. Helmantoler stated that she was going to kill herself as soon as she could and that her son was her purpose.

90.     While she was being escorted to the magistrate, Ms. Helmantoler repeatedly stated that she was going to kill herself.

91.     The Defendants never offered any resources to Ms. Helmantoler in relation to her mental health.

92.     Ms. Helmantoler also asked the Defendants if the hospital had told them what happened to A.D. and the police said they did not know yet.

93.     The Defendants "did not know yet" because they charged Ms. Helmantoler for causing the death of A.D. without an autopsy performed or a cause of death determined by any medical professional.

94.     Defendant Stallings drafted a criminal Complaint charging Ms. Helmantoler with Criminal Homicide, Aggravated Assault – Attempts to Cause Serious Bodily Injury, Aggravated Assault – Victim less than 13, Endangering Welfare of

Children, Aggravated Assault – Victim less than 6, and Recklessly Endangering Another

Person.

95.    The affidavit in support of these homicide and felony charges stated the

following:

> On the 12th of September, 2023, at approx. 08:51 hours, I Officer Stallings was dispatched to 201 Chess Street, Apartment B, for Washington County 911 Dispatch Center reporting that there is a 12 day old baby not breathing and the caller is not communicating with 911 dispatchers, while also refusing CPR.
>
> I arrived on scene to observe the baby in the back of Tri Community Ambulance Service ambulance, where it was clear that EMT's were conducting CPR on the child. I opened the side door to the ambulance asked the EMT's if they needed anything, to which I then looked at the child and observed blood on the child's face, where the EMT's then stated that they found this situation to be suspicious as there was blood on the child's face, as it appeared to be coming out from the nose area. The EMT's then went on to say that the mother, identified as Darian Helmantoler, went back inside the residence and left the medics out with the baby. I entered the residence to find HELMANTOLER sitting on a bed on her cellphone, unknown as to who she was talking to. Upon observing HELMANTOLER, blood was located on her right chest. HELMANTOLER was now placed in handcuffs and informed that she was being detained and was read her Miranda Rights. HELMANTOLER stated that if her baby is dead, she wants to go to jail otherwise she will kill herself. HELMANTOLER went on to say that the baby was bleeding from his nose, and had a small cut on his forehead, which she claimed to of been from his sharp fingernails. HELMANTOLER was placed on the front porch of the residence where she explained that she was unsure as to if anyone entered the residence overnight, and wishes she had camera's to see exactly what happened. HELMANTOLER went on to say that she was sleeping with the child and fed the baby a bottle around 04:00 hours, then must've fallen back asleep. I asked HELMANTOLER if the child sleeps with her in the bed all the time, to which HELMANTOLER stated that this is the second night that she allowed the baby to sleep in the bed with her. Two (2) Twisted Tea Alcoholic beverages were located on the front porch of the residence (201 Chess Street, Apt. B), however were on separate tables. HELMANTOLER was asked if anyone was with her as the drinks are on two (2) separate tables, which HELMANTOLER stated that she was the only one living at

the residence, and nobody else was at the residence. HELMANTOLER's
mother arrived at the residence, where HELMANTOLER broke down and
started to cry, then changed emotions rather quickly, asking for someone to
get her vape. The mother of HELMANTOLER stated that an Elijah Davis
lives with her. HELMANTOLER then stated once again that she would be
going to jail if the baby is dead because it's her child. Lieutenant Lenzi
entered the residence again to find a paper towel in the bathroom that
appeared to be bloody.

At this point in time, PSP was contacted along with the Washington County
District Attorney's Office to initiate a investigation. I was notified by Penn
Highland Mon Valley Hospital that the child, A.D. ███████████, is now
deceased. Due to this, HELMANTOLER was brought to Monongahela City
Police Department for questioning by Washington County District
Attorney's Office Detective Mysza, Hancock and Monongahela City Police
Lieutentant Lenzi and HELMANTOLER indicated that she may have rolled
onto the child and also indicated that there may have been a baby camera
on the TV in the bedroom that may have been recording.

I then contacted Dr. Alex Sossong of Penn Highland Mon Valley Hospital
and was informed that the Doctor observed blue/grayish coloring in the
front of the neck and around the mouth of the child.

Based on the above probable cause, I asked this arrest warrant to be issued
so that defendant may be taken to answer for the charges I've set forth on
them.

Said affidavit is attached as Exhibit A and fully incorporated herein.

96.     Defendant Stallings' affidavit lacks any opinion, expert or otherwise, on

what caused A.D. to die.

97.     Defendant Ridge assisted in drafting and approved the filing of Defendant

Stallings' Complaint.

98.     Defendant Stallings provided the Complaint to the magistrate who did not

appear to ask any questions of Defendants Stallings, but signed the Complaint.

99.     Ms. Helmantoler was taken before a magistrate for arraignment.

100.    Ms. Helmantoler's family was present at the magistrate's office at the time Ms. Helmantoler was arraigned.

101.    Ms. Helmantoler's mother asked if she could enter into the courtroom to be present for the arraignment. This request was denied.

102.    While waiting for arraignment, Detective Mysza from the Washington County District Attorney's Office, continued to ask Ms. Helmantoler questions and speak with her.

103.    During the arraignment, the magistrate read Ms. Helmantoler her arraignment rights.

104.    He then stated that he denied bail.

105.    There was no evidence, or request for evidence or information, related to bail during the arraignment.

106.    Before being transferred to prison, Ms. Maslo, and other friends and family, met with Ms. Helmantoler, and Ms. Helmantoler once again stated that she was going to kill herself.

107.    She was then incarcerated at Defendant Washington County Correctional Facility.

108.    Ms. Helmantoler was incarcerated from September 12, 2023 until September 27, 2023.

109.    When she was incarcerated, she was twelve (12) days postpartum.

110.    As a result of being twelve (12) days postpartum, Ms. Helmantoler had painful stitches and experienced vaginal blood loss.

111.    For the first three (3) or four (4) days of incarceration, Ms. Helmantoler was placed on "suicide watch."

112.    She did not have ready access to a bathroom until the third day of her incarceration.

113.    Ms. Helmantoler was reprimanded when she requested access to a restroom or toilet.

114.    Ms. Helmantoler needed a restroom in order to deal with the painful stitches and vaginal blood loss.

115.    During the second day of her incarceration, Ms. Helmantoler asked to see a doctor and asked for some Tylenol.

116.    Prison Officials informed Ms. Helmantoler that Tylenol cost Five Dollars ($5.00).

117.    When Ms. Helmantoler asked how she could make the payment, officers informed Ms. Helmantoler that she could not pay for or receive the Tylenol.

118.    Ms. Helmantoler was not seen by medical staff until September 26 and, when seen, her condition was not taken seriously.

119.    Ms. Maslo asked if she could visit Ms. Helmantoler in prison in order to get A.D.'s Death Certificate signed to allow for a proper funeral.

120.    Prison Officials would not allow Ms. Malso to visit and made it very difficult for Ms. Helmantoler to get the Death Certificate.

121.    Eventually, it was signed, but at this point, A.D. had to be cremated before burial because his body had been sitting too long at the funeral home.

122.    Ms. Helmantoler never saw her son again after he was taken by the EMTs to the hospital.

123.    Defendant Stallings also drafted and signed three (3) search warrants related to Ms. Helmantoler's criminal case.

124.    On the day Ms. Helmantoler was arrested (September 12, 2023), Defendant Stallings drafted a search warrant for Ms. Helmantoler's residence where he requested to seize and search all of Ms. Helmantoler's electronics, including her cellphones and computers.

125.    This search warrant was executed, and Ms. Helmantoler's cellphones were seized and searched.

126.    The affidavit was almost identical to the affidavit attached to the Criminal Complaint (attached as Exhibit A) except for the last line which stated: "Based on the above probable cause, I ask that this warrant be issued so we may proceed."

127.    On September 15, 2023, Defendant Stallings drafted and signed a warrant to seize Ms. Helmantoler's clothes from the Washington County Correctional Facility.

128.    Again, the affidavit is almost identical to the affidavit attached to the Criminal Complaint (attached as Exhibit A) except for the last line which stated: "Based on the probable cause, I ask that this warrant be issued so we may collect clothing from the accused for trace DNA testing."

129.    This search warrant was executed and Ms. Helmantoler's clothes were seized.

130.    On August 10, 2024, Defendant Stallings drafted and signed a search

warrant for Ms. Helmantoler's medical records from Jefferson Hospital from August 1,

2023 to September 13, 2023.

131.    The affidavit is almost identical to the affidavit attached to the Criminal

Complaint (attached as Exhibit A) except for the following lines:

   a.  "There were obvious signs of intoxication of Helmantoler during the course
       of our conversation" and

   b.  "Based on the above probable cause, I ask that this warrant be issued for
       the medical records of Darian Helmantoler be obtained as these records will
       aid in the investigation as it relates to the education provided to the mother
       of the child regarding co-sleeping and what medication was given to the
       mother at discharge."

132.    This search warrant was executed and Ms. Helmantoler's medical records

were seized and reviewed by Defendants.

133.    It is believed, and therefore averred, that Defendant Ridge assisted in

drafting all three search warrants and approved the execution of all three search warrants.

**B.  <u>Malicious Prosecution of Darian Helmantoler</u>**

134.    On or about September 12, 2023, Dr. L. Rozin performed the autopsy on

A.D., and Defendant Stallings attended the autopsy.

135.    Dr. Rozin stated the following opinion:  "The cause of death of [A.D.], a 2-

week-old white male is sudden infant death syndrome." Said Autopsy Report is attached

as Exhibit B and fully incorporated herein.

136.    The Washington County Coroner did not opine that A.D.'s cause of death

was homicide.

137.    The Washington County Coroner did not opine that Ms. Helmantoler caused A.D.'s death.

138.    Despite the autopsy concluding that A.D.'s cause of death was Sudden Infant Death Syndrome (hereinafter "SIDS") and failing to conclude that Ms. Helmantoler caused A.D.'s death, Defendants Jason Walsh and Leslie Ridge decided to move forward with the prosecution of Ms. Helmantoler.

139.    The preliminary hearing for the above-referenced charges took place on or about October 6, 2023, where Ms. Helmantoler waived her preliminary hearing in exchange for a bond reduction that allowed her to be released from prison.

140.    On or about May 10, 2024, Dr. Edward Mazuchowski of Forensic Pathology Associates, reviewed A.D.'s case and issued a letter to Defendant Ridge. Said letter is attached as Exhibit C and fully incorporated herein.

141.    Dr. Mazuchowski offered the following opinion:  "Based on available information, it is my opinion that [A.D.], a 2-week-infant male, died of Unexplained Sudden Death (Extrinsic Factors Identified). A death is certified as Unexplained Sudden Death when after investigation and autopsy examination, a specific disease process or injury etiology leading to death cannot be definitively determined. Extrinsic factors identified are co-sleeping and in utero exposure to tobacco. Extrinsic factors are defined as conditions in the immediate environment that are a potential threat to life." Exhibit C.

142.    Further Dr. Mazuchowski opined, "By report, the mother *may* have rolled on the infant. Depending on the position of the infant and the position of the mother, this *may* represent an asphyxia death due to overlay." Exhibit C (emphasis added).

143.    Despite this second opinion that A.D. died from something other than homicide, Defendants Ridge and Walsh decided to continue to prosecute Ms. Helmantoler.

144.    On or about February 23, 2025, Dr. Anthony Marino, M.D. authored an export report regarding the death of A.D. This report was made at the request of Ms. Helmantoler. Said report is attached as Exhibit D and fully incorporated herein.

145.    Dr. Marino opined as follows:

a.    "Important pertinent negative findings in the autopsy of A.D. by Dr. Rozin included:

    i.    No petechial findings in conjunctiva of the eyes;

    ii.    No petechial findings on face;

    iii.    Nasal bones were intact;

    iv.    No foreign material in nares;

    v.    No foreign material in mouth;

    vi.    No evidence of crepitus in bones (no fractures);

    vii.    X-Ray showed no evidence of skeletal trauma;

    viii.    No evidence of skeletal trauma of the bones of the head; and

    ix.    Normal brain on examination." Exhibit D.

b.    "The Findings of Edward Mazuchoski, M.D., who did not actually see the baby or perform the autopsy, were 4x5x0.1 cm subcutaneous hemorrhage over the calvarium (skull bones), but no hemorrhage or injury to the brain or its coverings are noted." Exhibit D.

c.    "SIDS or SUID is a term for neonatal death when no obvious causes are found after a death scene investigation and after postmortem evaluation. This is exactly what we have in the death of baby [A.D.]. Dr. Mazuchoski

never gave a reason for [A.D.]'s death. He called it SUI and said there were 'Extrinsic Factors Identified.' In the second paragraph he used the word 'may' twice and 'depending' once, but never gave a definitive opinion that the cause of death was anything but SIDS." Exhibit D.

d.   "Based on my education, training, and 30+ year experience as a neonatologist I am concluding that [A.D.'s] death was SIDS. There are no other definitive findings that were presented as having occurred, only suggested. I serve the right to amend my report if new information is presented. All the opinions contained in this report have been made to a reasonable degree of medical certainty." Exhibit D.

146.    This report was provided to Defendants Jason Walsh and Leslie Ridge.

147.    Despite a third expert opinion that Ms. Helmantoler did not cause the death of A.D., Defendants Walsh and Ridge decided to continue prosecuting Ms. Helmantoler.

148.    Counsel representing Ms. Helmantoler in the criminal case filed multiple motions seeking to dismiss the criminal charges against Ms. Helmantoler due to lack of probable cause and lack of evidence.

149.    Defendants Walsh and Ridge opposed these motions and the Court of Common Pleas of Washington County denied the motions.

150.    Despite overwhelming evidence that Ms. Helmantoler did not cause of the death of A.D., Defendants Jason Walsh and Leslie Ridge continued to prosecute Ms. Helmantoler.

151.    On or about April 7 to April 10, 2025, a jury trial occurred on the charges lodged by Defendants Jason Ridge, Leslie Walsh, and Washington County District Attorney's Office.

152.    During the jury trial, the experts testifying for Defendants Ridge and Walsh stated that A.D. died because of SIDS or SUDS and could not opine to any kind of degree of medical certainty that Ms. Helmantoler killed A.D. or contributed to the death of A.D.

153.    Despite this lack of evidence, Defendants Ridge and Walsh continued to prosecute Ms. Helmantoler.

154.    On or about April 10, 2025, the jury found Ms. Helmantoler not guilty of all charges.

C.  **Damages to Ms. Helmantoler**

155.    As a result of the incidents described above, Ms. Helmantoler sought psychiatric treatment for her anxiety and depression.

156.    Due to the actions of Defendants, Ms. Helmantoler suffered the following injuries:

      a.  Depression;

      b.  Anxiety with physical reactions such as rashes, hives, and sweats;

      c.  Irregular and painful menstrual cycles;

      d.  Insomnia;

      e.  Nightmares;

      f.  Costs of defending herself against charges that lack probable cause;

      g.  Costs associated with pre-trial electronic monitoring;

      h.  Physical injuries because of pre-trial electronic monitoring;

      i.  Medical expenses;

      j.  Loss of wages and employment;

k.   Other economic damages yet to be ascertained; and

l.   Other physical, emotional, and psychological injuries yet to be ascertained.

**COUNT I—VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT):  FALSE ARREST/FALSE IMPRISONMENT**

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

157.    The preceding paragraphs are incorporated as if fully set forth herein.

158.    False imprisonment is defined as (1) the detention of another person, and (2) the unlawfulness of such detention. ***Brockington v. City of Philadelphia,*** 354 F. Supp. 2d 563, 571-72 (E.D. Pa. 2005)).

159.    A defendant is liable for false imprisonment when he/she causes the false arrest of another person.

160.    A false arrest occurs when an arrest is made without probable cause or an arrest is made by a person without privilege to do so. ***Id.*** at 571.

161.    Probable cause exists when "the facts and circumstances which are within the knowledge of the police officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." ***Renk v. Pittsburgh***, 641 A.2d 289, 293 (Pa. 1994).

162.    "[W]here the officer lacks probable cause to make an arrest, there can be a Fourth Amendment claim for false imprisonment based on the detention pursuant to the arrest.'" ***Groman v. Manalapan***, 47 F.3d 628, 636 (3d Cir. 1995)).

163.    "Every arrest without a warrant involves a confinement which, if not privileged constitutes a false imprisonment." ***Osgood v. Borough of Shamokin Dam***, 420 A.2d 613, 615 (Pa. Super. 1980).

164.    Ms. Helmantoler was first detained by Defendants Lenzi and Stallings while in her residence.

165.    This detention occurred without a warrant.

166.    This detention occurred without probable cause.

167.    Defendants Stallings and Lenzi detained Ms. Helmantoler in her residence based on a supposition from the EMT that something seemed suspicious.

168.    The first detention was illegal and unconstitutional.

169.    Defendant Lenzi, Defendant Stallings, and Detective Mysza, from Washington County District Attorney's Office, then arrested Ms. Helmantoler after they interrogated her.

170.    There was no probable cause to arrest Ms. Helmantoler because Defendants failed to conduct a proper investigation or obtain reasonably trustworthy evidence of a crime.

171.    Defendant Stallings' Complaint (approved and edited by Defendant Ridge) was woefully inadequate to justify the arrest of Ms. Helmantoler.

172.    The first charge in Defendant Stallings' Complaint was Criminal Homicide under 18 Pa.C.S. §2501(a) of the Pennsylvania crimes code.

173.    Under 18 Pa.C.S. §2501(a), "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being."

174.    Further, "[c]ausation is an element of the crime of murder and must be proved beyond a reasonable doubt by the Commonwealth in every homicide prosecution." *Com. v. McCloud*, 322 A.2d 653, 655 (Pa. 1974).

175.    Here, the affidavit in support of probable cause fails to list a cause of death, let alone to allege that Ms. Helmantoler contributed to A.D.'s death, because Defendants Ridge, Stallings, and Lenzi, had no idea what caused A.D.'s death at the time Ms. Helmantoler was arrested.

176.    Without a cause of death, Defendants did not have probable cause to arrest Ms. Helmantoler for homicide.

177.    The second charge in Defendant Stallings' Complaint is Aggravated Assault under 18 Pa.C.S. §2702(a)(1).

178.    Under 18 Pa.C.S. § 2701(a)(1), a person commits Aggravated Assault if he/she "intentionally, knowingly, or recklessly" cause serious bodily injury to another."

179.    Additionally, under § 2702(a)(1), "recklessness manifesting 'extreme indifference to the value of human life' must be proven to establish aggravated assault. The corresponding *mens rea* for this standard is 'malice' defined… as 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.'" *Commonwealth v. McHale*, 858 A.2d 1209, 1212 (Pa. Super. 2004).

180.    Here, the affidavit of probable cause fails to present any evidence that Ms. Helmantoler caused any injuries to A.D., nor that she did so with malice.

181.    At best, the affidavit explains that Ms. Helmantoler *may* have rolled onto A.D. That is far from malice.

182.    Further, Defendant Stallings failed to explain that Ms. Helmantoler's statement that she may have rolled onto A.D. was only given after intense pressure from three police officers and after she denied multiple times that she woke up on top of A.D.

183.    Defendants lacked probable cause to arrest Ms. Helmantoler for Aggravated Assault.

184.    The third charge in Defendant Stallings' Complaint is Aggravated Assault under 18 Pa.C.S. §2702(a)(9).

185.    Under 18 Pa.C.S. §2702(a)(9), a person commits Aggravated Assault if he/she "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older."

186.    "Recklessness" for Aggravated Assault under § 2702(a)(9) is defined under 18 Pa.C.S. §302(b)(3) and states, "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."

187.    Here, Defendant Stallings had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, and immediately called 9-1-1.

188.    Meaning, Ms. Helmantoler acted immediately, like any reasonable person would have done in her circumstances.

189.    Further, causation is completely missing from Defendant Stallings' affidavit, so there was no evidence that Ms. Helmantoler caused A.D. to die nor that she seriously injured him.

190.    Defendants lacked probable cause to arrest Ms. Helmantoler for Aggravated Assault.

191.    The fourth charge in Defendant Stallings' Complaint is Endangering Welfare of Children under 18 Pa.C.S. §4304(a)(1). The charge of Endangering the Welfare of Children requires that the accused, "(1) is aware of his or her duty to protect the child; (2) is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and (3) has either failed to act or has taken actions so lame and meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare." *Commonwealth v. Foster*, 764 A.2d 1076, 1082 (Pa. Super. 2000) (citing *Commonwealth v. Cardwell*, 515 A.2d 311, 315 (Pa. Super. 1986)).

192.    Defendant Stallings alleges that Ms. Helmantoler committed this crime by "causing serious bodily injury resulting in the death of A.D. [DOB], in violation of Section 4304(a) of the PA Crimes Code."

193.    Once again, there is no cause of death in Defendant Stallings' Complaint, so it would not be possible for Defendants to have probable cause to arrest Ms. Helmantoler for Endangering the Welfare of Children.

194.    Further, Defendant Stallings had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, and immediately called 9-1-1.

195.    Meaning, Ms. Helmantoler acted immediately to protect the physical well-being of A.D.

196.    The fifth charge in Defendant Stallings' Complaint is Aggravated Assault under 18 Pa.C.S. §2702(a)(8).

197.    Under 18 Pa.C.S. §2702(a)(8), a person commits Aggravated Assault if he/she "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to a child less than six years of age, by a person 18 years of age or older."

198.    For the reasons explained above, Defendants did not have probable cause to arrest Ms. Helmantoler for Aggravated Assault of any kind.

199.    The sixth charge in Defendant Stallings' Complaint is Recklessly Endangering Another Person under 18 Pa.C.S. §2705.

200.    Under 18 Pa.C.S. §2705, a person commits the crime of Recklessly Endangering Another Person if he/she "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."

201.    The definition of recklessness under 18 Pa.C.S. § 302(b)(3) also applies to the charge of Recklessly Endangering Another Person.

202.    Here, Defendant Stallings had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, immediately called 9-1-1, and gave A.D. to the EMTs when they arrived.

203.    Meaning, Ms. Helmantoler acted immediately, like any reasonable person would have done in her circumstances.

204.    Thus, Defendants did not have probable cause to arrest Mr. Helmantoler for Recklessly Endangering Another Person.

205.    Defendants placed Ms. Helmantoler under arrest, ***without*** probable cause.

206.    Defendants relied on nothing more than a trauma induced search for answers in Ms. Helmantoler's frantic statement that she "may have" rolled on top of A.D. while being questioned and pressured by Defendants.

207.    Defendants acted with deliberate indifference in arresting Ms. Helmantoler.

208.    The Defendants' actions constitute willful misconduct.

209.    "[T]he common law presumption raised by a magistrate's prior finding that probable cause exists does not apply to section 1983 actions." ***Merkle v. Upper Dublin Sch. Dist.***, 211 F.3d 782, 789 (3d Cir. 2000).

210.    Equally important, "the question of probable cause in a section 1983 damage suit is one for the jury." ***Id***. at 788 (citing ***Montgomery v. De Simone***, 159 F.3d 120, 124 (3d Cir. 1998); *see also* ***Sharrar v. Felsing***, 128 F.3d 810, 818 (3d Cir. 1997); ***Deary v. Three Un–Named Police Officers***, 746 F.2d 185, 190–92 (3d Cir. 1984)).

211.    Critically, when a "probable cause determination rests on credibility conflicts" it is improper to deny a plaintiff's claim at the pleadings stage. *See Merkle*, supra at 788 (citing *Sharrar*, 128 F.3d at 818; *Deary*, 746 F.2d at 192).

212.    In short, "Because of its fact-specific nature, the existence or absence of probable cause is ordinarily a question of fact appropriate for resolution by a jury. *Adams v. Springmeyer*, 17 F. Supp. 3d 478, 495 (W.D. Pa. 2014).

213.    "[I]f an arrest lacks probable cause for its support it is, objectively speaking, in violation of clearly established law." *Deary*, at 192.

214.    Defendants acted knowingly, deliberately, and/or with reckless disregard of the truth in detaining and then arresting Ms. Helmantoler.

215.    The aforementioned conduct deprived Ms. Helmantoler of rights, privileges or immunities secured by the Constitution of the United States including a deprivation of liberty.

216.    The Defendants' acts were with malice and reckless disregard for Ms. Helmantoler's federally protected constitutional and civil rights.

217.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

a.    Depression;

b.    Anxiety with physical reactions such as rashes, hives, and sweats;

c.    Irregular and painful menstrual cycles;

d.    Insomnia;

   e.   Nightmares;

   f.   Costs of defending herself against charges that lack probable cause;

   g.   Costs associated with pre-trial electronic monitoring;

   h.   Physical injuries because of pre-trial electronic monitoring;

   i.   Medical expenses;

   j.   Loss of wages and employment;

   k.   Other economic damages yet to be ascertained; and

   l.   Other physical, emotional, and psychological injuries yet to be ascertained.

218.   Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

219.   Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained at trial.

220.   Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

## COUNT II—VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT):  ILLEGAL SEARCH AND SEIZURE

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

221.    The preceding paragraphs are incorporated as if fully set forth herein.

222.    "An officer who applies for a warrant, when it is clear that no probable cause for a search warrant exists, may be liable for damages under § 1983." *Williams v. Caso*, No. 23-CV-3945, 2024 WL 5126264, at 4 (E.D. Pa. Dec. 16, 2024); citing to *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

223.    "A search warrant is valid if: (1) a neutral and disinterested magistrate issues it; (2) those seeking the warrant demonstrate probable cause to the magistrate; and (3) the warrant particularly describes the 'things to be seized' and 'the place to be searched.'" *Id*. citing *Dalia v. United States*, 441 U.S. 238, 255 (1979).

224.    Defendants applied for a warrant when it was clear that no probable cause existed to search or seize anything from Ms. Helmantoler.

225.    Further, Defendants failed to demonstrate probable cause to the magistrate.

226.    Since the affidavits of probable cause attached to all three search warrants were essentially identical to the Criminal Complaint, Defendants lacked probable cause for the same reasons explained in Count I of this Complaint.

227.    There was no evidence that Ms. Helmantoler caused the death of A.D. or injured A.D., so searching her home, her cellphones, her computers and seizing her

clothes and medical records were a gross violation of her Fourth and Fourteenth

Amendment rights.

228.    The aforementioned conduct deprived Ms. Helmantoler of rights, privileges

or immunities secured by the Constitution of the United States including a violation of

her right against unreasonable searches and seizures.

229.    The Defendants' acts were with malice and reckless disregard for Ms.

Helmantoler's federally protected constitutional and civil rights.

230.    As a direct and proximate result of the unlawful conduct of the Defendants,

as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury

as follows:

      a.   Depression;

      b.   Anxiety with physical reactions such as rashes, hives, and sweats;

      c.   Irregular and painful menstrual cycles;

      d.   Insomnia;

      e.   Nightmares;

      f.   Costs of defending herself against charges that lack probable cause;

      g.   Costs associated with pre-trial electronic monitoring;

      h.   Physical injuries because of pre-trial electronic monitoring;

      i.   Medical expenses;

      j.   Loss of wages and employment;

      k.   Other economic damages yet to be ascertained; and

      l.   Other physical, emotional, and psychological injuries yet to be ascertained.

231.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

232.    Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained at trial.

233.    Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

### COUNT III— VIOLATION OF 42 U.S.C. § 1983:  INVASION OF RIGHT TO PRIVACY

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

234.    The preceding paragraphs are incorporated as if fully set forth herein.

235.    Under, 42 U.S.C. §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

236.    "The Constitution protects us from extensive and intrusive governmental scrutiny not in furtherance of bona fide state goals." *Carbone v. Horner*, 682 F. Supp. 824, 826 (W.D. Pa. 1988).

237.    "The liberty interest in privacy encompasses ... the freedom from being required to disclose personal matters to the government.... The disclosure strand of the privacy interest in turn includes the right to be free from the government disclosing private facts about its citizens and from the government inquiring into matters in which it does not have a legitimate and proper concern." *Id*. quoting *Ramie v. City of Hedwig Village, Texas*, 765 F.2d 490 (5th Cir.1985).

238.    The acts of Defendants constitute a violation of Plaintiff's constitutional right to privacy.

239.    Defendants are state actors subject to the United States Constitution.

240.    Defendants were acting under the color of state law.

241.    Defendants acted intentionally and with callous and reckless disregard for Plaintiff's clearly established constitutional rights.

242.    Defendants engaged in extensive and intrusive scrutiny into Plaintiff's life including searching her cellphone and reviewing her medical records.

243.    Defendants engaged in this intrusive behavior without a legitimate and proper concern because all three search warrants used to search and seize Plaintiff's property lacked probable cause.

244.    Further, Defendants were not acting in further of any bona fide state goals because they lacked probable cause to search or seize anything from Ms. Helmantoler.

245.    As a direct and proximate result of the unlawful conduct of the Defendants, as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

      a.  Depression;

      b.  Anxiety with physical reactions such as rashes, hives, and sweats;

      c.  Irregular and painful menstrual cycles;

      d.  Insomnia;

      e.  Nightmares;

      f.  Costs of defending herself against charges that lack probable cause;

      g.  Costs associated with pre-trial electronic monitoring;

      h.  Physical injuries because of pre-trial electronic monitoring;

      i.  Medical expenses;

      j.  Loss of wages and employment;

      k.  Other economic damages yet to be ascertained; and

      l.  Other physical, emotional, and psychological injuries yet to be ascertained.

246.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial.

247.    Ms. Helmantoler will suffer lost future earnings and impaired earning capacities in amounts to be ascertained at trial.

248.    Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

### COUNT IV—VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT):  MALICIOUS PROSECUTION

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

249.    The preceding paragraphs are incorporated as if fully set forth herein.

250.    "To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.'" ***Harvard v. Cesnalis,*** 973 F.3d 190, 203 (3d Cir. 2020), quoting ***Estate of Smith v. Marasco***, 318 F.3d 497, 521 (3d Cir. 2003).

251.    Defendants initiated criminal proceedings against Ms. Helmantoler, *e.g.* investigations, detentions, searches, arrests, interrogations, the filing of criminal charges, and a jury trial.

252.    These criminal proceedings ended in Ms. Helmatoler's favor when the jury issued a verdict of not guilty on all charges.

253.    Defendants lacked probable cause to initiate any criminal proceedings against Ms. Helmtantoler and persisted in prosecuting her despite this lack of probable cause and evidence that indicated that she was not guilty of any crime.

254.    In addition to Defendant Stallings' Complaint, Defendants Jason Walsh, Leslie Ridge, and the Washington County District Attorney's Office, filed a Criminal Information against Ms. Helmantoler, charging her with Criminal Homicide, Aggravated Assault-Attempts to Cause or Causes Serious Bodily Injury, Aggravated Assault—Victim Less than 13 years Old and Defendant 16 or Older, Endangering the Welfare of Children, Aggravated Assault—Victim Less Than 6 Years Old and Defendant 18 Years Old or Older, and Recklessly Endangering Another Person.

255.    As explained above, under 18 Pa.C.S. §2501(a), "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being."

256.    Further, "[c]ausation is an element of the crime of murder and must be proved beyond a reasonable doubt by the Commonwealth in every homicide prosecution. ***Com. v. McCloud***, 322 A.2d 653, 655 (Pa. 1974)."

257.    The Washington County Coroner determined that A.D.'s cause of death was SIDS.

258.    The Washington County Coroner did not determine that A.D.'s cause of death was homicide.

259.    The Defendants' second expert determined that A.D.'s cause of death was unexplained sudden death (extrinsic factors identified).

260.    The second expert did not determine that A.D.'s cause of death was homicide.

261.    Despite the fact that both of Defendants' medical experts determined that A.D. did not die of homicide, or that Ms. Helmantoler caused the death of A.D., Defendants persisted in prosecuting Ms. Helmantoler for homicide.

262.    The Defendants never had in their possession any indication, or evidence, or opinion from a medical expert that Ms. Helmantoler caused the death of A.D.

263.    In initiating criminal proceedings against Ms. Helmantoler for homicide and persisting in those proceedings, Defendants were acting maliciously and/or for a purpose other than bringing Ms. Helmantoler to justice.

264.    As explained above, under 18 Pa.C.S. § 2701(a)(1), a person commits Aggravated Assault if he/she "intentionally, knowingly, or recklessly" cause serious bodily injury to another."

265.    Additionally, under § 2702(a)(1), "recklessness manifesting 'extreme indifference to the value of human life' must be proven to establish aggravated assault. The corresponding *mens rea* for this standard is 'malice' defined… as 'wickedness of

disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.'" ***Commonwealth v. McHale***, 858 A.2d 1209, 1212 (Pa. Super. 2004).

266.    Defendants lacked probable cause that Ms. Helmantoler caused any injuries to A.D. or that she acted with malice.

267.    At best, Defendants had a trauma induced statement from Ms. Helmantoler that she ***may*** have rolled onto A.D. after intensive unjustified interrogation. That is far from malice.

268.    Further, as explained above, Defendants lacked evidence that Ms. Helmantoler caused the death of A.D. or that she seriously injured A.D.

269.    By initiating criminal proceedings against Ms. Helmantoler for Aggravated Assault and persisting in those proceedings, Defendants were acting maliciously and/or for a purpose other than bringing Ms. Helmantoler to justice.

270.    As explained above, a person commits Aggravated Assault under 18 Pa.C.S. §2702(a)(9) if he/she "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older."

271.    "Recklessness" for Aggravated Assault under § 2702(a)(9) is defined under 18 Pa.C.S. § 302(b)(3) and states, "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the

circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."

272.    Here, Defendants had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, immediately called 9-1-1, and then gave A.D. to the EMTs when they arrived.

273.    Meaning, Ms. Helmantoler acted immediately, like any reasonable person would have done in her circumstances.

274.    Further, Defendants lack any evidence of causation, so there was no evidence that Ms. Helmantoler caused A.D. to die nor that she seriously injured him.

275.    By initiating criminal proceedings against Ms. Helmantoler for Aggravated Assault and persisting in those proceedings, Defendants were acting maliciously and/or for a purpose other than bringing Ms. Helmantoler to justice.

276.    The charge of Endangering the Welfare of Children requires that the accused, "(1) is aware of his or her duty to protect the child; (2) is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and (3) has either failed to act or has taken actions so lame and meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare." ***Commonwealth v. Foster***, 764 A.2d 1076, 1082 (Pa. Super. 2000) (citing ***Commonwealth v. Cardwell***, 515 A.2d 311, 315 (Pa. Super. 1986)).

277.    Once again, Defendants' experts determined that A.D.'s cause of death was something other than homicide, so Defendants did not have probable cause to initiate

criminal proceedings and continue to prosecute Ms. Helmantoler for Endangering the Welfare of Children.

278.    Further, Defendants had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, immediately called 9-1-1, and give A.D. to EMS when they arrived.

279.    Meaning, Ms. Helmantoler acted immediately to protect the physical well-being of A.D.

280.    By initiating criminal proceedings against Ms. Helmantoler for Endangering the Welfare of Children, and persisting in those proceedings, Defendants were acting maliciously and/or for a purpose other than bringing Ms. Helmantoler to justice.

281.    Under 18 Pa.C.S. §2702(a)(8), a person commits Aggravated Assault if he/she "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to a child less than six years of age, by a person 18 years of age or older."

282.    For the reasons explained above, Defendants did not have probable cause to arrest Ms. Helmantoler for Aggravated Assault of any kind.

283.    As explained above, under 18 Pa.C.S. §2702(a)(8), a person commits Aggravated Assault if he/she "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to a child less than six years of age, by a person 18 years of age or older."

284.    For the reasons explained above, Defendants did not have probable cause to initiate criminal proceedings and then persist in prosecuting Ms. Helmantoler for any kind of Aggravated Assault.

285.    As explained above, under 18 Pa.C.S. §2705, a person commits the crime of Recklessly Endangering Another Person if he/she "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."

286.    The definition of recklessness under 18 Pa.C.S. § 302(b)(3) also applies to the charge of Recklessly Endangering Another Person.

287.    Here, Defendants had no evidence that Ms. Helmantoler did anything other than what she said—woke up, saw A.D. was in distress, immediately called 9-1-1, and gave A.D. to the EMTs when they arrived.

288.    Meaning, Ms. Helmantoler acted immediately, like any reasonable person would have done in her circumstances. Her conduct was not reckless.

289.    Defendants acted intentionally, knowingly, and maliciously in initiating criminal proceedings without probable cause and continuing to prosecute Ms. Helmantoler despite this lack of probable cause.

290.    Defendants were acting for a purpose other than bringing Ms. Helmantoler to justice.

291.    Ms. Helmantoler suffered a deprivation of her liberty, including, but not limited to arrest, detention, pre-trial incarceration, and pre-trial supervision as a result of Defendants' actions.

292.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

      a.  Depression;

      b.  Anxiety with physical reactions such as rashes, hives, and sweats;

      c.  Irregular and painful menstrual cycles;

      d.  Insomnia;

      e.  Nightmares;

      f.  Costs of defending herself against charges that lack probable cause;

      g.  Costs associated with pre-trial electronic monitoring;

      h.  Physical injuries because of pre-trial electronic monitoring;

      i.  Medical expenses;

      j.  Loss of wages and employment;

      k.  Other economic damages yet to be ascertained; and

      l.  Other physical, emotional, and psychological injuries yet to be ascertained.

293.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

294.    Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

295.    Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to

42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the

Defendants for monetary and compensatory damages in an amount in excess of the

jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory

and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

### COUNT V—VIOLATION OF 42 U.S.C. § 1983:  CONSPIRACY

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

296.    The preceding paragraphs are incorporated as if fully set forth herein.

297.    Defendants, acting under color of state law, willfully, knowingly and

purposefully with the intent to deprive Ms. Helmantoler of her rights, privileges and

immunities secured by the Constitution and the laws of the United States, in violation of

42 U.S.C. §1983, particularly, conspired to deprive Ms. Helmantoler of her Fourth

Amendment and Fourteenth Amendment rights.

298.    In doing the acts and things above complained of, the Defendants were

conspirators engaged in a scheme and conspiracy designed and intended to deny and

deprive Ms. Helmantoler of the rights guaranteed to her under the United States

Constitution and laws of the United States, more specifically, her Fourth Amendment and

Fourteenth Amendment rights.

299.    The Defendants committed the acts described herein were with malice and reckless disregard for Ms. Helmantoler's federally protected constitutional and civil rights.

300.    Defendants conspired to falsely claim that Ms. Helmantoler intentionally killed and/or knowingly, intentionally, or recklessly caused serious bodily injury to her newborn baby in order to justify filing false charges against Ms. Helmantoler.

301.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

    a.  Depression;

    b.  Anxiety with physical reactions such as rashes, hives, and sweats;

    c.  Irregular and painful menstrual cycles;

    d.  Insomnia;

    e.  Nightmares;

    f.  Costs of defending herself against charges that lack probable cause;

    g.  Costs associated with pre-trial electronic monitoring;

    h.  Physical injuries because of pre-trial electronic monitoring;

    i.  Medical expenses;

    j.  Loss of wages and employment;

    k.  Other economic damages yet to be ascertained; and

    l.  Other physical, emotional, and psychological injuries yet to be ascertained.

302.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

303.    Ms. Helmantoler will suffer lost future earnings and impaired earning capacities in amounts to be ascertained in trial.

304.    Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Ms. Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

## COUNT VI—VIOLATION OF 42 U.S.C. § 1983:  FOURTH AND FOURTEENTH AMENDMENT FAILURE TO SUPERVISE and *MONELL* CLAIM

### Darian Helmantoler v. The City of Monongahela, City of Monongahela Police Department, and Washington County District Attorney's Office

305.    The preceding paragraphs are incorporated as if fully set forth herein.

306.    Defendants, City of Monongahela and the City of Monongahela Police Department by and through their agents and employees, i.e., Defendants Brady Stallings and Ryan Lenzi, acting under color of state law, acted willfully, knowingly and purposefully, with the intent to deprive the Ms. Helmantoler of her rights, privileges and immunities secured by the Constitution and the laws of the United States, in violation of

42 U.S.C. § 1983, particularly, they deprived Ms. Helmantoler of her Fourth and Fourteenth Amendment rights.

307.    Defendant, Washington County District Attorney's Office, by and through their agents and employees, i.e., all of the individual Defendants herein, acting under color of state law, acted willfully, knowingly and purposefully, with the intent to deprive the Ms. Helmantoler of her rights, privileges and immunities secured by the Constitution and the laws of the United States, in violation of 42 U.S.C. § 1983, particularly, they deprived Ms. Helmantoler of her Fourth and Fourteenth Amendment rights and maliciously prosecuted her.

308.    Local municipalities and governmental bodies are "persons" for purposes of Section 1983.

309.    In order to preserve the issue, Ms. Helmantoler contends that ***Monell v. New York City Department of Social Services***, 436 U.S. 658 (1978), was erroneously decided to the extent that it held that the doctrine of respondeat superior does not apply to §1983 claims. ***City of St. Louis v. Praprotnik***, 485 U.S. 112, 148 (1988) (Stevens, J., dissenting); *see also **Oklahoma City v. Tuttle**,* 471 U.S. 808, 834–44 (1985) (Stevens, J., dissenting); ***Pembaur v. Cincinnati***, 475 U.S. 469, 489, n. 4 (1986)) (Stevens, J., concurring in part and concurring in judgment); *see also **Whitman, Government Responsibility for Constitutional Torts***, 85 Mich.L.Rev. 225, 236 n. 43 (1986).

310.    Recognizing that this Court is bound by ***Monell***, Ms. Helmantoler avers that the City of Monongahela, the City of Monongahela Police Department, and Washington County District Attorney's Office are liable for the violation of Ms.

Helmantoler's Fourth and Fourteenth Amendment rights because they executed a policy and/or custom and/or practice that inflicted the injuries herein.

311.    Liability against a governmental unit may exist under § 1983 where a Plaintiff's constitutional rights were violated based on a governmental custom, even if the custom has not been formally sanctioned.

312.    Additionally, a governmental unit may be liable under Section 1983 if there is a failure to supervise or train. *See **City of Canton v. Harris**, 489 U.S. 378 (1989).

313.    The City of Monongahela and the City of Monongahela Police Department failed to adequately supervise and train Defendants Brady Stallings and Ryan Lenzi in the proper procedure for investigating and charging crimes which resulted in Ms. Helmantoler being detained, charged, arrested, and incarcerated without probable cause.

314.    The Washington County District Attorney's Office failed to adequately supervise and train Defendants Jason Walsh and Leslie Ridge on the proper procedure for investigating, charging, and prosecuting crimes which resulted in Ms. Helmantoler being detained, charged, arrested, incarcerated, and prosecuted without probable cause.

315.     The failure to supervise and train showed a "deliberate indifference" to the rights of persons with whom the Defendants would come into contact.

316.    Ms. Helmantoler had the following clearly established rights at the time of the complained of conduct:  (1) the right to be secure in her person from unreasonable searches and unreasonable seizures under the Fourth and Fourteenth Amendments; (2) the right to be free from illegal arrest and false imprisonment under the Fourth and

Fourteenth Amendments; (3) the right to be free from malicious prosecution; and (4) the right to privacy.

317.    All Defendants knew, or should have reasonably known, of these rights at the time of the complained of conduct, as they were clearly established at that time.

318.    The acts or omissions of these Defendants, as described herein, deprived Ms. Helmantoler of her constitutional and statutory rights.

319.    Defendants are not entitled to qualified or absolute immunity for the complained of conduct.

320.    The deliberately indifferent training and supervision provided by Defendants City of Monongahela, City of Monongahela Police Department, and the Washington County District Attorney's Office resulted from a conscious or deliberate choice to follow a course of action among various alternatives available to Defendants City of Monongahela, City of Monongahela Police Department, and the Washington County District Attorney's Office and were moving forces in the constitutional and federal violation injuries complained of by Ms. Helmantoler.

321.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

     a.  Depression;

     b.  Anxiety with physical reactions such as rashes, hives, and sweats;

     c.  Irregular and painful menstrual cycles;

     d.  Insomnia;

    e.   Nightmares;

    f.   Costs of defending herself against charges that lack probable cause;

    g.   Costs associated with pre-trial electronic monitoring;

    h.   Physical injuries because of pre-trial electronic monitoring;

    i.   Medical expenses;

    j.   Loss of wages and employment;

    k.   Other economic damages yet to be ascertained; and

    l.   Other physical, emotional, and psychological injuries yet to be ascertained.

322.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

323.    Ms. Helmantoler is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

## COUNT VII—VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF EIGHTH AMENDMENT):  CRUEL AND UNUSUAL PUNISHMENT

### Darian Helmantoler v. Washington County and Washington County Correctional Facility.

324.    The preceding paragraphs are incorporated as if fully set forth herein.

325.    "The Eighth Amendment prohibits 'cruel and unusual punishments,' and 'reaffirms the duty of the government to respect the dignity of all persons.'" ***Moore v. Texas***, 581 U.S. 1, 12 (2017) (quoting ***Hall v. Florida***, 572 U.S. 701, 701 (2014)).

326.    "'To enforce the Constitution's protection of human dignity,' we 'loo[k] to the evolving standards of decency that mark the progress of a maturing society,' recognizing that '[t]he Eighth Amendment is not fastened to the obsolete.'" ***Id***. at 12. (quoting ***Hall v. Florida***, 572 U.S. 701, 708 (2014)).

327.    "To prove deliberate indifference under the Eighth Amendment, a plaintiff must establish that '(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff.'" ***Williams v. Secretary Pennsylvania Department of Corrections***, 117 F.4th 503, 514 (3d Cir. 2024) (citing ***Durham v. Kelley***, 82 F.4th 217, 229 (3d Cir. 2023)).

328.    "A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm." ***Giles v. Kearney***, 516 F. Supp. 2d 362, 369 (D. Del. 2007), aff'd, 571 F.3d 318 (3d Cir. 2009) (citing ***Farmer v. Brennan***, 511 U.S. 825, 837 (1994)).

329.    "A prison official may manifest deliberate indifference by 'intentionally denying or delaying access to medical care.'" *Id*. at 369. (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, (1976)).

330.    "To state a claim for deliberate indifference to a medical need, a plaintiff must show '(1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.'" *Stuart v. Pierce*, 587 F. Supp. 3d 127, 137 (D. Del. 2022) (quoting *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

331.    "Failing to provide a seriously mentally ill prisoner with meaningful mental health care can be the basis for a viable deliberate indifference claim…" *Id*. at 137.

332.    Defendants acted with deliberate indifference to Ms. Helmantoler's medical and mental health condition surrounding being newly postpartum.

333.    Ms. Helmantoler exhibited clear suicidal ideations that were not taken seriously by Defendants.

334.    Ms. Helmantoler was reprimanded for requesting to use the restroom to deal with her stitches and vaginal blood loss as a result of being newly postpartum.

335.    Despite repeated requests, Ms. Helmantoler's medical condition was not taken seriously by Defendants, and she did not receive appropriate treatment.

336.    The Defendants' actions constitute willful misconduct as any reasonable person and/or correctional officer should have known that Ms. Helmantoler faced a substantial risk of serious harm if her condition was not properly treated.

337. Washington County and the Washington County Correctional Facility failed to adequately supervise their employees how to deal with people who are physically and psychologically injured while incarcerated pre-trial.

338. The failure to supervise and train showed a "deliberate indifference" to the rights of persons with whom the employees of Defendant would come into contact with.

339. Ms. Helmantoler had the following clearly established right to be free from cruel and unusual punishment at the time she was incarcerated.

340. All Defendants knew, or should have reasonably known, of these rights at the time of the complained of conduct, as they were clearly established at that time.

341. The acts or omissions of these Defendants, as described herein, deprived Ms. Helmantoler of her constitutional and statutory rights.

342. Defendants are not entitled to qualified or absolute immunity for the complained of conduct.

343. The deliberately indifferent training and supervision provided by Defendants Washington County and the Washington County Correctional Facility resulted from a conscious or deliberate choice to follow a course of action among various alternatives available to Defendants Washinton County and the Washington County Correctional Facility and were moving forces in the constitutional and federal violation injuries complained of by Ms. Helmantoler.

344. As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

   a.  Depression;

   b.  Anxiety with physical reactions such as rashes, hives, and sweats;

   c.  Irregular and painful menstrual cycles;

   d.  Insomnia;

   e.  Nightmares;

   f.  Costs of defending herself against charges that lack probable cause;

   g.  Costs associated with pre-trial electronic monitoring;

   h.  Physical injuries because of pre-trial electronic monitoring;

   i.  Medical expenses;

   j.  Loss of wages and employment;

   k.  Other economic damages yet to be ascertained; and

   l.  Other physical, emotional, and psychological injuries yet to be ascertained.

316.   Defendant, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

WHEREFORE, Ms. Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

## COUNT VIII—STATE LAW CLAIM:  FALSE ARREST/FALSE IMPRISONMENT

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

317.    The preceding paragraphs are incorporated as if fully set forth herein.

318.    The elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention. ***Brockington v. City of Philadelphia***, 354 F. Supp. 2d 563, 572, fn. 10 (E.D. Pa. 2005).

319.    A defendant is liable for false imprisonment when he/she causes the false arrest of another person.

320.    Under state law, a false arrest is defined as either an arrest made without probable cause or an arrest made by a person without privilege to do so. ***Id***. at 571.

321.    Probable cause exists when "the facts and circumstances which are within the knowledge of the police officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." ***Renk v. Pittsburgh***, 641 A.2d 289, 293 (Pa. 1994).

322.    "[W]here the officer lacks probable cause to make an arrest, there can be a Fourth Amendment claim for false imprisonment based on the detention pursuant to the arrest.'" ***Groman v. Manalapan***, 47 F.3d 628, 636 (3d Cir. 1995)).

323.    "Every arrest without a warrant involves a confinement which, if not privileged constitutes a false imprisonment." ***Osgood v. Borough of Shamokin Dam***, 420 A.2d 613, 615 (Pa. Super. 1980).

324.    There was no probable cause to arrest or detain Ms. Helmantoler because Defendants failed to conduct a proper investigation or obtain reasonably trustworthy evidence of a crime.

325.    Defendants acted with deliberate indifference to Ms. Helmantoler's rights in arresting Ms. Helmantoler.

326.    The Defendants' actions constitute willful misconduct as any reasonable person and/or officer should have known that arresting Ms. Helmantoler without any probable cause was unlawful.

327.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

    a.    Depression;

    b.    Anxiety with physical reactions such as rashes, hives, and sweats;

    c.    Irregular and painful menstrual cycles;

    d.    Insomnia;

    e.    Nightmares;

    f.    Costs of defending herself against charges that lack probable cause;

    g.    Costs associated with pre-trial electronic monitoring;

    h.    Physical injuries because of pre-trial electronic monitoring;

      i.   Medical expenses;

      j.   Loss of wages and employment;

      k.   Other economic damages yet to be ascertained; and

      l.   Other physical, emotional, and psychological injuries yet to be ascertained.

328.   As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual psychological and emotional injuries, and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial.

329.   Ms. Helmantoler will suffer lost future earnings and impaired earning capacities in amounts to be ascertained in trial.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary and compensatory damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

### COUNT IX—STATE LAW CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

330.   The preceding paragraphs are incorporated as if fully set forth herein.

331.   The Defendants' actions in falsely filing criminal charges, falsely imprisoning Ms. Helmantoler for two (2) weeks, and maliciously prosecuting her was

made with a tortious intent for the purpose of inflicting upon Ms. Helmantoler severe and acute emotional distress.

332.    Defendants' actions in lying to Ms. Helmantoler about the state of her son A.D. was made with a tortious intent for the purpose of inflicting upon Ms. Helmantoler severe and acute emotional distress.

333.    The Defendants' actions were made with the intent to harm and harass Ms. Helmantoler, with a reckless disregard for the truth and a reckless disregard for Ms. Helmantoler's rights.

334.    Ms. Helmantoler is entitled to receive punitive or exemplary damages in an amount to be determined at a trial upon the issues.

335.    The aforesaid intentional and wanton acts of Defendants have caused Ms. Helmantoler severe emotional distress.

336.    Because of the Defendants' actions, Ms. Helmantoler struggles to leave her house without extreme anxiety and fear.

337.    Because of the Defendants' actions Ms. Helmantoler has suffered physical harm including: stress and anxiety, ongoing mental suffering, hives and rashes, sweating, and difficulty sleeping.

338.    Defendants conduct herein was extreme and outrageous, and Defendants acted intentionally and recklessly and with willful misconduct thereby causing severe emotional distress to Ms. Helmantoler.

339.    "Willful misconduct, for the purposes of tort law, has been defined by [the Pennsylvania] Supreme Court to mean conduct whereby the actor desired to bring about

the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." ***Renk v. Pittsburgh***, 641 A.2d 289, 293 (Pa. 1994) (citing ***Evans v. Phila. Transp. Co***., 212 A.2d 440, 443 (Pa. 1965)).

340.    Defendants conduct against Ms. Helmantoler, as explained above, would cause average members of the community to arouse their resentment against the Defendants and lead them to exclaim, "Outrageous!"

341.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

      a.  Depression;

      b.  Anxiety with physical reactions such as rashes, hives, and sweats;

      c.  Irregular and painful menstrual cycles;

      d.  Insomnia;

      e.  Nightmares;

      f.  Costs of defending herself against charges that lack probable cause;

      g.  Costs associated with pre-trial electronic monitoring;

      h.  Physical injuries because of pre-trial electronic monitoring;

      i.  Medical expenses;

      j.  Loss of wages and employment;

      k.  Other economic damages yet to be ascertained; and

      l.  Other physical, emotional, and psychological injuries yet to be ascertained.

342.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial.

343.    Ms. Helmantoler will suffer lost future earnings and impaired earning capacities in amounts to be ascertained in trial.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary, compensatory, and punitive damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**A JURY TRIAL IS DEMANDED.**

### COUNT X—STATE LAW CLAIM:  ABUSE OF PROCESS

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

344.    The preceding paragraphs are incorporated as if fully set forth herein.

345.    Defendants initiated criminal proceedings against Ms. Helmantoler, *e.g.* investigations, searches, arrests, the filing of criminal charges, and a jury trial.

346.    These processes were used primarily to accomplish a purpose for which they were not intended.

347.    Defendants' acts were done with malice and were done with willful, wanton, or reckless disregard for Plaintiff's constitutional and civil rights, thereby subjecting Defendants to punitive damages.

348.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

    a.  Depression;

    b.  Anxiety with physical reactions such as rashes, hives, and sweats;

    c.  Irregular and painful menstrual cycles;

    d.  Insomnia;

    e.  Nightmares;

    f.  Costs of defending herself against charges that lack probable cause;

    g.  Costs associated with pre-trial electronic monitoring;

    h.  Physical injuries because of pre-trial electronic monitoring;

    i.  Medical expenses;

    j.  Loss of wages and employment;

    k.  Other economic damages yet to be ascertained; and

    l.  Other physical, emotional, and psychological injuries yet to be ascertained.

349.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial.

350.    Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary, compensatory, and punitive damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**JURY TRIAL DEMANDED.**

### COUNT XI—STATE LAW CLAIM:  INTENTIONAL INTERFERENCE WITH DEAD BODY

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, Washington County District Attorney's Office, Washington County, and Washington County Correctional Institue**

351.    The preceding paragraphs are incorporated as if fully set forth herein.

352.    Ms. Helmatoler is the mother of the deceased child, A.D.

353.    Ms. Helmantoler was entitled to the disposition of the body of A.D.

354.    Without privilege, Defendants intentionally withheld the body of her newborn infant son from Ms. Helmantoler.

355.    Defendants wantonly mistreated the body of A.D. by seizing it from the hospital and refusing to allow Ms. Helmantoler to see the body of her newborn infant son.

356.    Defendants wantonly mistreated the body of A.D. by subjecting it to an autopsy without privilege to do so.

357.    Defendants wantonly mistreated the body of A.D. by preventing Ms. Helmantoler from signing his death certificate, thus necessitating that his body be cremated.

358.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

   a.  Depression;

   b.  Anxiety with physical reactions such as rashes, hives, and sweats;

   c.  Irregular and painful menstrual cycles;

   d.  Insomnia;

   e.  Nightmares;

   f.  Costs of defending herself against charges that lack probable cause;

   g.  Costs associated with pre-trial electronic monitoring;

   h.  Physical injuries because of pre-trial electronic monitoring;

   i.  Medical expenses;

   j.  Loss of wages and employment;

   k.  Other economic damages yet to be ascertained; and

   l.  Other physical, emotional, and psychological injuries yet to be ascertained.

359.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

360.    Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary, compensatory, and punitive damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate.

**JURY TRIAL DEMANDED.**

### COUNT XII—STATE LAW CLAIM: CIVIL CONSPIRACY

**Darian Helmantoler v. Jason Walsh, Leslie Ridge, Brady Stallings, and Ryan Lenzi, in their individual capacities, City of Monongahela Police Department, City of Monongahela, and Washington County District Attorney's Office.**

361. The preceding paragraphs are incorporated as if fully set forth herein.

362. Defendants acted with a common purpose to unlawfully detain, charge, arrest, and prosecute Ms. Helmantoler.

363. Defendants committed the following overt acts in furtherance of their common purpose:

    a.  Unlawfully detained her at her home;

    b.  Unlawfully detained her at a police station;

    c.  Unlawfully subjected her to extensive police interrogation;

    d.  Unlawfully arrested her for crimes that lacked probable cause;

    e.  Unlawfully charged her for crimes that lacked probable cause; and

    f.  Unlawfully prosecuted her for crimes when there was no evidence she committed the crimes.

364. Defendants acted with malice in the commission of these overt acts.

365.    As a direct and proximate result of the unlawful conduct of the Defendants as aforesaid, Ms. Helmantoler has suffered and will continue to suffer irreparable injury as follows:

    a.  Depression;

    b.  Anxiety with physical reactions such as rashes, hives, and sweats;

    c.  Irregular and painful menstrual cycles;

    d.  Insomnia;

    e.  Nightmares;

    f.  Costs of defending herself against charges that lack probable cause;

    g.  Costs associated with pre-trial electronic monitoring;

    h.  Physical injuries because of pre-trial electronic monitoring;

    i.  Medical expenses;

    j.  Loss of wages and employment;

    k.  Other economic damages yet to be ascertained; and

    l.  Other physical, emotional, and psychological injuries yet to be ascertained.

366.    As a direct result and proximate result of the unlawful conduct of the Defendants, Ms. Helmantoler has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

367.    Ms. Helmantoler will suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

WHEREFORE, Darian Helmantoler respectfully requests judgment against the Defendants for monetary, compensatory, and punitive damages in an amount in excess of the jurisdictional limit of said Court, plus court costs, interest, attorneys' fees, declaratory and prospective injunctive relief, and other damages as the Court deems appropriate. **JURY TRIAL DEMANDED.**

Respectfully submitted,

/s/ D. Robert Marion Jr.
D. Robert Marion Jr., Esq.
PA ID 313469
CHARLTON LAW
617 S. Pike Road
Sarver, Pa 16055
Telephone:    724.540.1161
Fax:              724.540.1164
bobby@charltonlawyers.com